# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## BOWLING GREEN DIVISION

CIVIL ACTION NO. 1:10-CR-00040-JHM

UNITED STATES OF AMERICA                                    PLAINTIFF

V.

DAGOBERTO GARCIA-GUILLEN, and
JESUS GARCIA-GUILLEN                                        DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants Dagoberto Garcia-Guillen and Jesus Garcia-Guillen's Motion to Suppress [DN #35]. Having held a hearing on this matter and reviewed the parties' briefs, it is ripe for decision. For the following reasons, the Court **DENIES** the Defendants' motion to suppress.

## I. BACKGROUND

At approximately 11:30 p.m. on October 1, 2010, the Department of Homeland Security (DHS) contacted the Bowling Green Police Department (BGPD) regarding a plane bearing the tail number N8334C. The BGPD was told that the occupants of the plane had exhibited suspicious behavior when they were refueling in Oklahoma and that they were expected to land in Bowling Green shortly. DHS asked that the BGPD identify the plane's occupants and investigate their conduct.

The plane landed at the Bowling Green airport at approximately 11:54 p.m.[1] The plane's two occupants, Defendants Dagoberto and Jesus Garcia-Guillen, exited the plane, and entered the lobby of the airport while their plane was being refueled. Sargent Casey of the BGPD arrived at the airport

---

[1] The Court bases the timing of the following events from the time stamp found on Government's Exhibit 1, the airport security video.

at 11:59. As he was parking his car, he looked into the lobby of the airport and saw the Defendants. At this point, the Defendants exited the lobby and headed back to their plane. Sargent Casey entered the airport, walked through the lobby, and exited onto the tarmac to speak with the Defendants. He was quickly joined on the tarmac by Officers Davidson and Allen and a police intern.

Sargent Casey informed the Defendants that he was an officer with the BGPD and that his department had received a call from DHS regarding suspicious actions involving their plane.[2] He then stated that the officers "were just there to investigate what was going on, and to identify who [the Defendants] were and to identify what their side of the story was, and we were going to document who they were[.]" (Hr'g Tr. 15, March 18, 2011.) Sargent Casey then asked the Defendants to present their identification and pilot's license. Defendant Dagoberto walked to the side of the plane, followed by Officer Davidson, and retrieved his pilot's license and passport and the passport of his brother Jesus. Officer Davidson examined the documents near the rear of the plane and then led Defendant Dagoberto back to the front of the plane. At this point, Officer Davidson began to run a National Crime Information Center (NCIC) check for warrants and criminal history.

While Officer Davidson retained the Defendants' travel documents, Sargent Casey asked the Defendants several questions including where they were traveling and why. Defendant Dagoberto answered that he had recently received his pilot's license and that he and his brother were flying around the country attempting to log flight hours. He also told Sargent Casey that they were flying at night because there was less traffic in the air, which made it easier to fly. After having the brothers' passports and pilot's license for approximately two and a half minutes, Sargent Casey asked the Defendants if they had anything illegal on the plane. Defendant Dagoberto answered no. Sargent

---

[2] While Dagoberto was sufficiently fluent in English to communicate with the Officers, Jesus did not speak English and communicated very little with the Officers.

Casey then asked if the Officers could search the plane, to which Dagoberto responded "sure."

Without giving back the brothers' documents, Sargent Casey instructed Officer Allen to begin searching the plane. During Officer Allen's search, Dagoberto re-entered the lobby of the airport to pay for the gas he had purchased. Sargent Casey followed him inside remaining only footsteps behind him. While Dagoberto was paying for the gas, Officer Allen found thirty (30) bricks wrapped in tape and plastic inside two suitcases in the plane. The bricks weighed approximately one kilogram a piece and were suspected to contain cocaine. At this point, the Defendants were handcuffed and read their Miranda rights, in Spanish, by another Officer who had just recently arrived. The contraband was eventually field tested and tested positive for cocaine. Defendants were each charged with violating 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1).

## II. DISCUSSION

Defendants have moved to suppress the evidence discovered in the search of the plane. They argue that although Defendant Dagoberto gave consent to search the plane that the consent was invalid because the Defendants were unlawfully seized in violation of the Fourth Amendment when the consent was given. Furthermore, the Defendants argue that the Officers exceeded the scope of the consent by searching closed containers within the plane. The government has responded arguing that the encounter between the Defendants and the Officers was a consensual encounter, that no seizure ever occurred, that the consent given was voluntary, and that the scope of the consent was never exceeded. The government has argued, in the alternative, that if the Defendants were seized, that the seizure was valid under 14 C.F.R. § 61.3(l), which requires all pilots of aircraft to present a valid pilot's license and identification when such documents are requested by a law enforcement

officer.[3]

"Not all encounters between the police and citizens are seizures within the meaning of the Fourth Amendment." United States v. Winfrey, 915 F.2d 212, 216 (6th Cir. 1990). The Sixth Circuit has recognized three types of police-citizen contact: (1) a consensual encounter that requires no reasonable suspicion, such as where the police approach an individual and ask him if he is willing to answer some questions,; (2) an investigative or Terry-stop predicated on reasonable suspicion, such as the temporary detention of a person meeting the drug courier profile at an airport; and (3) an arrest or seizure that is predicated on probable cause that a crime has been or is being committed. United States v. Flowers, 909 F.2d 145, 147 (6th Cir. 1990).

It is clear that law enforcement officers are free to approach individuals on the street or in public places and ask to speak with them. United States v. Drayton, 536 U.S. 194, 200 (2002). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage-provided they do not induce cooperation by coercive means." Id. at 201. When law enforcement officers engage in this type of encounter, it has been considered consensual, with no implication of the Fourth Amendment. Florida v. Bostick, 501 U.S. 429, 434 (1991). However, "an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" I.N.S. v. Delgado, 466 U.S. 210, 215

---

[3] Although the government and Defendants address their arguments as to both Defendants, the Court finds that it need not reach the issue of the lawfulness of Defendant Jesus's detention to address the merits of this motion. The evidence that the Defendants seek to suppress was not the fruit of Defendant Jesus's alleged unlawful detention, rather, it was the fruit of Defendant Dagoberto's grant of consent. Therefore, the Court will address the issues raised by the parties in regards to Defendant Dagoberto only.

(1984) (quoting <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980)).  In <u>Florida v. Bostick</u>, the Supreme Court found that where an individual's "freedom of movement was restricted by a factor independent of police conduct . . . the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."  501 U.S. 429, 436 (1991).

Whether a reasonable person would feel free to leave or terminate the encounter is determined by looking at the totality of the circumstances.  <u>Northrop v. Trippett</u>, 265 F.3d 372, 380 (6th Cir. 2001) (citing <u>Terry v. Ohio</u>, 392 U.S. 1, at 19 n.15).  "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs."  <u>Michigan v. Chesternut</u>, 486 U.S. 567, 573 (1988).  Some of the traditional factors that courts have looked to are the threatening presence of several officers, the display of a weapon by an officer, any physical touching of the individual by an officer, and the officer's language or tone of voice.  <u>Mendenhall</u>, 446 U.S. at 554.  Other pertinent factors include the time, place, and purpose of the encounter, whether the officer indicated to the individual that he was free to leave, <u>United States v. Weaver</u>, 282 F.3d 302, 310 (4th Cir. 2002), and whether the officer asks for and retains identification documents.[4]

---

[4] <u>See</u> <u>Florida v. Royer</u>, 460 U.S. 491, 501-02 (1983) (finding the retention of suspect's airline ticket and driver's license a factor in the determination of whether a seizure had occurred); <u>United States v. Lopez</u>, 443 F.3d 1280, 1286 (10th Cir. 2006) (finding retention of driver's license to run warrants check without reasonable suspicion was an unlawful seizure); <u>United States v. Jordan</u>, 958 F.2d 1085, 1089 (D.C. Cir. 1992) (finding the suspect had been seized after an officer asked for and then retained the suspect's driver's license); <u>United States v. Cordell</u>, 723 F.2d 1283, 1285 (7th Cir. 1983) (finding that a consensual encounter became a detention once the officers retained the suspect's driver's license and airline ticket); <u>United States v. Waksal</u>, 709 F.2d 653, 660 (11th Cir. 1983) (finding the retention of suspect's driver's license and airline ticket to be a factor in determining that the suspect had been seized for purposes of the Fourth Amendment).

An examination of the relevant facts in the present case reveals that after landing at the Bowling Green airport, the Defendants were met by three uniformed police officers who informed the Defendants why they were at the airport. The Officers requested and received the Defendants' passports and pilot's license and then began running an NCIC check, which included a check for warrants, on the Defendants' names. The record reflects that after retaining the Defendants' passports and pilot's license for approximately two and a half minutes, consent to search the plane was granted. Although the Officers did not inform the Defendants that they were free to leave or give them back their passports or pilot's license, it is uncontested that the Officers did not have their weapons drawn, did not physically touch the Defendants, and spoke in a calm and relaxed tone during the encounter.

While it is undisputed that the Officers continued to retain the Defendants' identification documents for the duration of the encounter, the Court need not determine if the consensual encounter ripened into a seizure at some point after the consent was given. Because the evidence sought to be suppressed is the product of the consent that was given two and a half minutes after the documents were retained, the Court need only determine if the Defendants were seized prior to the grant of consent. Looking to the totality of the circumstances, the Court finds that the Defendants were not seized at the time consent to search the plane was granted. When a person gives police officers his identification, he implicitly gives them a reasonable amount of time to examine it. The Court finds that the retention of identification for two and a half minutes (or 150 seconds) is not an unreasonable retention and a reasonable person would not feel seized during such an encounter. See United States v. Carpenter, 462 F.3d 981, 985 (8th Cir. 2006) (finding an officer's retention of a suspect's driver's license for five minutes while the officer ran a computerized check of the identification was not a seizure). This is especially true in light of the type of documents that the Officers were attempting to verify; two foreign passports and a pilot's license.

The Officers did not use coercive measures, language, or tone, nor did they conduct a show of force by drawing their weapons, physically touching the Defendants or ordering them to move away from their plane. The two and a half minutes that the Officers' retained the Defendants' documents was a reasonable period of time that allowed the Officers to examine the documents. Under these circumstances, the Court finds that a reasonable person would have felt free to terminate the encounter and that the Defendants were not seized at the time consent to search the plane was granted.

However, assuming *arguendo* that the initial consensual encounter transformed into a seizure of Defendants prior to the granting of consent to search the plane, the Court finds that the evidence would still be admissible as a permissible stop under 14 C.F.R. § 61.3(l). This regulation states that "[n]o person may serve as a required pilot flight crewmember of a civil aircraft of the United States, unless that person . . . [h]as a pilot certificate or special purpose pilot authorization . . . and . . . a photo identification that is in that person's physical possession or readily accessible in the aircraft when exercising the privileges of that pilot certificate or authorization."[5] Requirement for Certificates, Ratings, and Authorizations, 14 C.F.R. §§ 61.3(a)(1),(2) (2009). The regulation also states that "[e]ach person who holds an airmen certificate . . . or license required by this part must present it and their photo identification . . . for inspection upon a request from . . . [a]ny federal, state, or local law enforcement officer[.]" 14 C.F.R. § 61.3(l)(3).

The government does not argue that reasonable suspicion existed to warrant the seizure of the Defendants, however, notwithstanding the lack of reasonable suspicion, the government argues that the seizure was a valid investigatory stop pursuant to 14 C.F.R. § 61.3(l). The government argues

---

[5] An official passport satisfies the photo identification requirement. 14 C.F.R. § 61.3(a)(2)(iv).

that because the Defendants flew an aircraft within the United States, that the Bowling Green police officers, as local law enforcement, were entitled to request the Defendants' passports and pilot's license pursuant to 14 C.F.R. § 61.3(l) and that Defendants were required to produce those documents. Such a request is known as a "ramp check." In essence, the government is arguing that reasonable suspicion is unnecessary to conduct a ramp check pursuant to 14 C.F.R. § 61.3. Neither the parties' briefs nor the Court's research has revealed authority addressing this particular issue. The Court will begin its analysis on this issue by examining the regulation itself to determine if it requires law enforcement officers to possess reasonable suspicion prior to requesting a pilot's certificate and identification.

The Court has found two substantive regulations that address a request by law enforcement officers to examine a pilot's documents. The first, 14 C.F.R. § 61.3(l), states that "[e]ach person who holds an airman certificate, medical certificate, authorization, or license required by this part must present it and their photo identification . . . upon a request from . . . [a]ny Federal, State or local law enforcement officer[.]" Requirement for Certificates, Ratings, and Authorizations, 14 C.F.R. § 61.3(l)(3) (2009). The second, 14 C.F.R. § 61.51(i), states that "[p]ersons must present their pilot certificate, medical certificate, logbook, or any other record required by this part for inspection upon a *reasonable request* by . . . [a]ny Federal, State, or local law enforcement officer." Pilot Logbooks, 14 C.F.R. 61.51(i)(1)(iii) (2009) (emphasis added).

While it is unclear what a "reasonable request" may be, the Court believes, based on the comments submitted during the regulation's promulgation process, a request is reasonable when an officer possesses sufficient reasonable suspicion to request to see the documents. Submitted with the comments for § 61.51(i) was a comment addressing the Aircraft Owners and Pilots Association's

(AOPA) "concern about the deletion of the word 'reasonable'" from the proposed version of § 61.51(i). <u>See</u> Pilot, Flight Instructor, Ground Instructor, and Pilot School Certification Rules, 62 Fed. Reg. 16220, 16250 (April 4, 1997) (comments for final rule). The AOPA, "[c]iting the constitutional protection against unreasonable search and seizure[,]" believed that the deletion of the term "reasonable" "could lead to abuse by law enforcement officials." <u>Id.</u> The Federal Aviation Administration's (FAA) response simply stated that the term "reasonable" was inadvertently deleted in the proposed rule and that the phrase "reasonable request" would be retained in the final rule. <u>Id.</u> at 16251. The Court interprets the comments and language of § 61.51(i) to mean a request which is reasonable under the Fourth Amendment. The Court notes that no such comment was made regarding § 61.3(l)'s lack of the term "reasonable" in its production requirements and that the final version of § 61.3(l) merely says "request." <u>See</u> <u>Id.</u> at 16239.

The Court is at a loss as to why an individual is required to produce his pilot and medical certificates under § 61.3(l) upon any request and why the same individual is required to produce those same documents under § 61.51(i) only upon a "reasonable request." Perhaps the difference lies with § 61.51(i)'s requirement that a pilot also produce his logbook. While a logbook might reveal vital details regarding the actions of the pilot and his previous whereabouts, a pilot or medical certificate would merely reveal background information on the pilot and whether his certificates were current. If that were indeed the reason for the different standards then the Court would expect § 61.51(i)'s tougher production standard to apply to those documents not covered under § 61.3(l)'s lower standard. However, the language of § 61.51(i) applies to a person's pilot and medical certificate just as § 61.3(l) does. Given § 61.3(l)'s lower standard, the Court cannot envision a time when documents such as a pilot's certificate or medical certificate would ever be requested under §

61.51(i).[6]  Taking into account the regulation's language and inconsistences, the Court finds that the regulation is ambiguous regarding the drafters' intent as to the necessary level of suspicion required by law enforcement to request to see a pilot's certificate and identification.  As the Court is unable to determine if the regulation calls for reasonable suspicion prior to a request under § 61.3(l), the Court will analyze the issue under the framework of the Fourth Amendment.

The Court has found two lines of cases by the Supreme Court to be very instructive in the determination of this issue.  The first line of cases involves the detention of individuals in automobiles without reasonable suspicion or probable cause pursuant to a state licensing statute.  The second line of cases involves the detention and boarding of ships to examine documents without reasonable suspicion or probable cause pursuant to a federal Customs' statute.

The Supreme Court has held that police officers cannot stop and detain an individual in an automobile simply to check the validity of his driver's license and registration without reasonable suspicion or probable cause that some law is being violated.  See Deleware v. Prouse, 440 U.S. 648 (1979).  At issue in Prouse was a Delaware statute that required a driver of an automobile to have a valid license and registration.  In Prouse, an officer initiated a stop without reasonable suspicion pursuant to the licensing statute.  When the officer walked up to the car, he smelled marijuana and upon further investigation found marijuana in plain view of the floor board.  The officer later testified that he had no reasonable suspicion or probable cause that the defendant's vehicle was breaking any laws, but "[he] saw the car in the area and wasn't answering any complaints, so [he] decided to pull

---

[6] The redundancy of § 61.51(i) application to pilot and medical certificates is noted by the commentators in the comments to the final rule, but is ignored and not addressed by the FAA in its response.  See Pilot, Flight Instructor, Ground Instructor, and Pilot School Certification Rules, 62 Fed. Reg. 16220, 16250-51 (April 4, 1997) (comments for final rule).

them off."[7]  Prouse, 440 U.S. at 650-51.

The Prouse court, analyzing the stop under the Fourth Amendment, stated that

the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.  Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test.

Id. at 654.  The Court cited at length its earlier opinion in Brignoni-Ponce, which held that roving patrols of Border agents could not stop and detain "persons for questioning about their citizenship on less than reasonable suspicion that they may be aliens."  United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975).  The Prouse Court found that the physical and psychological intrusion occasioned by random "spot checks" is akin to the intrusion held unconstitutional in the case of roving border patrol stops in Brignoni-Ponce.  Prouse, 440 U.S. at 657.  The Court found that a random "spot check" required the officer to pull over a vehicle in a show of force, interfering with the individual's freedom of movement, which was likely to create substantial anxiety.  Id.  The Court also noted that automobile travel "is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities[,]" and although automobiles are regulated by the government, an individual does not lose all reasonable expectation of privacy simply by operating or traveling in an automobile.  Id. at 662.

The intrusion caused by the "spot checks" was then balanced against the state's interest in conducting such stops.  The Court recognized that the state had a legitimate interest in "ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for

_____

[7] The Supreme Court in Prouse refers to stops engaged at random to check the validity of a driver's license and registration as "spot checks."

safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed." Id. at 658. Notwithstanding that interest, the Court found that "[t]he marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the roads to a seizure-limited in magnitude compared to other intrusions but nonetheless constitutionally cognizable-at the unbridled discretion of law enforcement officials." Id. at 661. The Court also discussed the presence of alternative mechanisms for achieving the state's legitimate interest such as standard road blocks or fixed checkpoints that eliminated the officer's discretion regarding whom to pull over and whom to let go. Id. at 659. However, the Court found that the most effective way of achieving the safety interest advanced by the state was by acting upon observed violations of traffic and safety regulations. Id.

When the intrusion and inefficiency of the "spot checks," the interest of the government, and the presence and effectiveness of alternative enforcement mechanisms were analyzed together and balanced against one another, the Court held that

> except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.

Id. at 663.

The Supreme Court was faced with a similar situation in United States v. Villamonte-Marquez, 462 U.S. 579 (1983). In Villamonte-Marquez, Customs agents were patrolling a river channel 18 miles inland of the Gulf Coast when they observed an anchored sailboat in the channel that was rocked by the wake of a much larger ship. The agents approached the vessel and asked an individual on the deck of the sailboat if everyone was alright. The individual simply shrugged his shoulders in response. The Customs agents then boarded the ship and requested to see the vessel's

documentation.  While checking the sailboat's documents, the Custom's agents smelled burning marijuana and, looking through an open hatch, saw burlap-wrapped bales of marijuana.  A subsequent search of the ship discovered 5,800 pounds of marijuana.

At issue in Villamonte-Marquez was the validity of the suspicionless seizure occasioned by the Customs agents boarding and examination of the sailboat's documentation.  Under 19 U.S.C. § 1581(a) "any officer of the Customs may at any time go on board of any vessel . . . at any place in the United States or within the Customs waters . . . and examine the manifest and other documents and papers . . . ."  Although the Customs agents had no articulable facts to support reasonable suspicion or probable cause of wrongdoing, they nevertheless boarded the ship and requested to examine its documentation.  The Supreme Court began its analysis of the agents' actions by stating that "[o]ur focus in this area of Fourth Amendment law has been on the question of the 'reasonableness' of the type of governmental intrusion involved."  Villamonte-Marquez, 462 U.S. at 588.  The Court applied the same test used in Prouse to determine the "reasonableness" of the suspicionless boarding and examination of documents by balancing the intrusion into the defendant's Fourth Amendment interests by the  practice against the promotion of legitimate governmental interests served by the practice.  Id.

The Court first noted that the particular statute at issue had an "impressive historical pedigree."  Id. at 585.  The precursor to § 1581 was adopted by the same Congress that adopted the Bill of Rights.  Id.  The Court found that "'[a]s this Act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as "unreasonable," and they are not embraced within the prohibition of the amendment.'"  Id. at 586-87 (quoting Boyd v. United States, 116 U.S. 616, 623 (1886)).

Following the examination of the statute's legislative history, the Court discussed the difference between the actions of the Customs agents at sea and similar actions on land on a highway. The Court made it clear that "if the Customs officers in this case had stopped an automobile on a public highway near the border, rather than a vessel in a ship channel, the stop would have run afoul of the Fourth Amendment because of the absence of articulable suspicion." Id. at 588 (citing United States v. Brignoni-Ponce, 422 U.S. 873 (1975)). However, the Court noted that the alternative mechanism for enforcement in the case of random stops on highways, the implementation of roadblocks or fixed checkpoints, would not be "practical on waters such as these where vessels can move in any direction at any time and need not follow established 'avenues' as automobiles must do." Id. at 589. In discussing this key difference the Court found that

> [s]muggling and illegal importation of aliens by land may, and undoubtedly usually does, take place away from fixed checkpoints or ports of entry, but much of it is at least along a finite number of identifiable roads. But while eventually maritime commerce on the inland waters of the United States may funnel into rivers, canals, and the like, which are more analogous to roads and make a "roadblock" approach more feasible, such is not the case in waters providing ready access to the seaward border, beyond which is only the open sea.

Id.

The Court further distinguished ships from automobiles by discussing the difference in licensing and registration among the two types of vehicles. While a police officer can usually determine if an automobile is in compliance with state regulations by examining the license plate and other outward markings of the vehicle, Customs agents cannot do the same by simply examining the outer markings of a ship. Id. at 590. Furthermore, the Supreme Court found that "[t]he panoply of statutes and regulations governing maritime documentation are likewise more extensive and more complex than the typical state requirements for vehicle licensing[.]" Id.

After discussing the differences between automobiles and ships, the Court discussed the

legitimate governmental interests that were served by the statute authorizing suspicionless boarding and examination of a ship's documentation. The Court found that the documentation statute served the public interest by: (1) being the linchpin for regulation of participation in trades, such as fishing, salvaging, towing, and dredging; (2) enforcing various environmental laws; (3) aiding in the collection of Customs duties and tonnage duties; (4) aiding in the regulation of imports and exports; and (5) preventing illegal aliens, controlled substances, and other prohibited items from entering the United States. Id. at 591. The Court found that the "[r]equests to check certificates of inspection play an obvious role in ensuring safety on American waterways[,]" and "compliance with United States shipping laws[.]" Id.

Balanced against these legitimate governmental interests, the Supreme Court found that the intrusion into the Fourth Amendment occasioned by suspicionless boarding and examination of a ship's documentation was "quite limited." Id. at 592. The Court acknowledged that the detention did impede an individual's ability to make free passage, but found that the delay was only brief. Id. Furthermore, the Court noted that officials only visited public spaces on the ship and that none of the passengers or the ship's private compartments were subjected to search. Id. The Court summarized this intrusion by stating that "[a]ny interference with interests protected by the Fourth Amendment is, of course, intrusive to some degree. But in this case, the interference created only a modest intrusion." Id. The Court held that the balance between the limited intrusion, the lack of alternative enforcement mechanisms available for inspection of ships, and the governmental interests served by the statute demonstrated that the suspicionless boarding and examination of a ship's documentation, where the ship has ready access to the open sea, was "reasonable" and not a violation of the Fourth Amendment.

In the instant case, the Court must determine the permissibility of a suspicionless request for

a pilot's certificate and identification by balancing the intrusion into the Fourth Amendment occasioned by the request against the governmental interest served by the request. The intrusion caused by the suspicionless request seems very similar to the intrusion caused by the roving patrols of Brignoni-Ponce or the random "spot checks" of Prouse, in that it interfere's with the freedom of movement, and is inconvenient and time consuming. The Prouse court focused on the physical and psychological intrusion occasioned by the random stop. The Court in the instant case does not find the "ramp check" results in the same physical or psychological damage as the random stop in Prouse.

Unlike the intrusions in Brignoni-Ponce and Prouse where the police initiated the intrusion by stopping the vehicles and pulling them over through a show of force with lights and sirens, the Defendants in the instant case were already stopped. They had landed and were refueling their plane when the Officers walked up to the Defendants and requested to see their identification and pilot's certificate. The Officers in question did not have to stop the plane, nor is it likely that under the regulation, a plane would be forced to land at the request of law enforcement in order to check the pilot's certificate and identification. Although this encounter briefly interfered with the Defendants' freedom of movement and likely created some anxiety on the part of the Defendants, the intrusion here is far less than that condemned in Brignoni-Ponce and Prouse.

The Court also notes that the intrusion occasioned by the "ramp check" is less severe than the intrusion upheld in Villamonte-Marquez, which included the boarding of the ship and presence of Customs agents in the ship's public areas. In the instant case, the regulation does not allow the officers to enter the airplane. Furthermore, like Villamonte-Marquez, neither the Defendants nor their airplane were searched pursuant to the regulation. The Court finds that there was an intrusion caused by the Officers' suspicionless request, but that intrusion was quite minimal.

The Court must now balance that limited intrusion against the legitimate governmental

interest served by the regulation. The interest that is served by § 61.3(l) is ensuring that only those that are qualified to operate airplanes, do so. While the Court recognizes the obvious public safety interest advanced by the regulation it finds that it is less compelling than the interests advanced in Prouse. In Prouse, the statute at issue allowed the officer to check the driver's license and registration. This afforded the officer conducting the "spot check" the opportunity not only to verify that the driver was qualified to operate the vehicle, but also that the vehicle was fit for safe operation. This dual verification is not present in the "ramp check" conducted in the instant case. 14 C.F.R. § 61.3(l) does not permit the officers to inspect the plane, rather it only requires the pilot to produce his certificate and identification. Furthermore, the law enforcement officers who conducted the "ramp check" do not appear to be qualified to verify the safety of the Defendants' airplane.

The Court also finds that the legitimate governmental interest in the "ramp checks" pales in comparison to the interest recognized in Villamonte-Marquez. In Villamonte-Marquez, the statute at issue allowed Customs agents to board a ship and examine its manifest and other documents and papers, which included documents regarding the registration of the boat. The Supreme Court found that these documents advanced several government interests in many significant ways, including regulation of exports and imports, collection of Customs duties, and the discovery of contraband. Villamonte-Marquez, 462 U.S at 591. In comparison, the "ramp check" under § 61.3(l) only allows law enforcement officers to verify who the pilot is and whether his certificates are valid. The regulation does not allow the law enforcement officers access to the same types of documents allowed under the statute in Villamonte-Marquez. Therefore, the several areas advanced in that case are not influenced whatsoever by the regulation at issue here. While the Court recognizes the legitimate governmental interest of ensuring that only those qualified to operate airplanes are actually allowed to operate airplanes, the Court also recognizes that this interest is less significant than those

identified in <u>Prouse</u> and <u>Villamonte-Marquez</u>.

Having identified the intrusion and interest served by the regulation, the Court finds it necessary to also examine the alternative enforcement mechanisms available for the enforcement of the regulation. In this respect, the Court finds that airplanes share many of the characteristics of ships identified by the Supreme Court in <u>Villamonte-Marquez</u>. Like a ship, airplanes are able to "move in any direction at any time and need not follow established 'avenues' as automobiles must do." <u>Villamonte-Marquez</u>, 462 U.S at 589. The ability of airplanes to travel in any direction at any moment at a multitude of heights, makes it nearly impossible to use fixed checkpoints to advance the licensing regulation. The Court also finds the <u>Prouse</u> court's suggestion that the "foremost method of enforcing . . . safety regulations . . . is acting upon observed violations," to be of little value under the current circumstances. Automobiles are constrained, for the most part, to the use of established roads, which enables law enforcement officers to easily identify automobile safety and registration violations by parking on the side of the road or driving along with traffic. The same procedure is unlikely to be productive when applied to airplanes, which are not constrained to any certain path. Although the Court is without the aid of empirical data addressing the number of unlicensed pilots discovered pursuant to suspicionless "ramp checks," it does not appear that the alternative enforcement mechanisms discussed above present a viable method of ensuring that only qualified individuals pilot airplanes.

Given the above considerations, the Court finds that the legitimate governmental interest of ensuring that only qualified individuals pilot airplanes outweighs, by the narrowest of margins, the minimal intrusion occasioned by suspicionless requests for an individual's identification and pilot's certificate. As Defendant Dagoberto was a pilot subject to the regulation, the Court finds that the Officers' detention of Defendant Dagoberto was lawful because law enforcement officers need not

18

possess reasonable suspicion to initiate an investigatory Terry-stop for the limited purpose of requesting and verifying a pilot's identification and pilot's certificate pursuant to 14 C.F.R. § 61.3(l).[8]

Whether the Defendants were engaged in a consensual encounter or were lawfully seized pursuant to the FAA regulation, the government must still prove by a preponderance of the evidence that Defendant Dagoberto's consent was freely and voluntarily given. United States v. Riascos-Suarez, 73 F.3d 616, 625 (6th Cir. 1996) *overruled on other grounds by* Muscarello v. United States, 524 U.S. 125 (1998). The Court must make the determination of the voluntariness of the consent based on the totality of the circumstances including "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." Id.

The facts before the Court demonstrate that Defendant Dagoberto was approximately twenty years of age on the night in question. The Officers testified that he claimed to have had some level of higher education. Furthermore, the Court finds that he had a valid pilot's license which demonstrates sufficient intelligence to navigate a plane and to abide by the regulations that govern flying private planes. Contrary to Defendant Dagoberto's contention that the Officers told him he could not leave until the plane was searched, the Court finds no evidence that the Officers ever made such a statement. Although the Officers failed to explain to Defendant Dagoberto that he had the right to refuse consent and there is no evidence that he understood his constitutional rights, the Court

---

[8] It appears to the Court that Defendant Jesus was merely a passenger on the plane and was not subject to the production requirements of 14 C.F.R. § 61.3(l). As discussed in footnote 3 above, although the government appears to argue that Defendant Jesus's detention was also lawful under 14 C.F.R. § 61.3(l), the Court need not reach that issue to address the merits of this motion. Therefore, the Court makes no finding as to the lawfulness of detaining passengers under 14 C.F.R. § 61.3(l).

finds under the totality of the circumstances that the Government has shown by a preponderance of the evidence that Defendant Dagoberto's consent was freely and voluntarily given.

The Defendants also argue that the Officers exceeded the scope of the consent when they searched the two suitcases within the plane. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991). "'If the consent to search is entirely open-ended, a reasonable person would have no cause to believe that the search will be limited in some way.'" United States v. Canipe, 569 F.3d 597, 605 (6th Cir. 2009) (quoting United States v. Snow, 44 F.3d 133, 135 (2d Cir. 1995)). Furthermore, general consent to search a vehicle includes consent to search closed containers within that vehicle. Jimeno, 500 U.S. at 250-251.

The Officers in the present case asked the Defendants if they had anything illegal on the plane and then asked if they could search the plane. Defendant Dagoberto responded in the affirmative and placed no constraints on the Officers' ability to search. The Officers made it clear that they were looking for anything illegal, which could be found in any container within the plane. The Officers' request was entirely open-ended and a reasonable person would have had no cause to believe it was limited to the confines of the plane itself, and not the containers within the plane. Therefore, the Court finds that the search of the closed suitcases did not exceed the scope of Defendant Dagoberto's consent.

Accordingly, the Court finds that the consent was freely and voluntarily given and that the scope of the consent was not exceeded, therefore, the evidence discovered pursuant to the search should not be suppressed.

**III. CONCLUSION**

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendants Dagoberto

Garcia-Guillen and Jesus Garcia-Guillen's Motion to Suppress [DN #35] is **DENIED**.

cc: counsel of record